494 P.2d 39

**Fred C. GARLING, Jr., et al., Appellants,**

**v.**

**John C. SEELEY et al., Appellees.**

**No. I CA–CIV 1510.**

Court of Appeals of Arizona,
Division 1,
Department B.
Feb. 29, 1972.
Rehearing Denied April 4, 1972.
Review Denied June 6, 1972.

Lewis & Roca, by John P. Frank, Phoenix, for appellants.

Laney, Warner & Angle, by Edward L. Roper, Phoenix, for appellees Fiduciary Research, Inc. and H. J. Miller.

Brown, Vlassis & Bain, by John J. Ross, Phoenix, for appellees Smith.

Philip T. Goldstein, Phoenix, for all other appellees.

HAIRE, Presiding Judge.

This appeal was brought by the defendants Fred C. Garling, Jr., Carol E. Garling and Stanley H. Trezevant, a co-partnership doing business as Garling & Trezevant, from a judgment ordering partition of real property held by the partnership as tenants in common with the plaintiffs, a group of Michigan investors, and ordering defendants to pay plaintiffs a sum determined by the trial court to be the "reasonable rent" for the period of time that defendants operated and managed the apartments located on the real property involved.

The case arises as an aftermath of the construction of the second of two different apartment buildings, one known as Harmony House and the other as the Top of the Tower Building, located on 5th Avenue immediately *north of Van Buren* in Phoenix, Arizona. The lawsuit results from a dispute emerging from financing arrangements for these buildings.

The Garling & Trezevant partnership was formed in 1962 to construct and operate the two apartment buildings abovementioned. The first was completed in 1962 and the second in 1964. In late 1963 the defendants, realizing that they would need additional funds to complete the second building, entered into negotiations in Detroit with Fiduciary Research, Inc., through its officer H. J. Miller to obtain investors to raise these funds. These latter named parties were financial advisors to the investing plaintiffs, and were joined as third party defendants in this case. As a result of negotiations between defendants and Fiduciary, a plan evolved under which the investing plaintiffs, primarily physicians in the Detroit area and the plaintiffs here, were to acquire a 50% undivided interest in the two apartment houses. It was contemplated that there would be some 18 to 20 of these investors who would each receive individual deeds to their pro rata undivided share of the property. All of the investors were to lease-back their undivided 50% interest in the two buildings to the defendants for a 10 year period. As a practical matter, what was contemplated was what is commonly referred to in the real estate trade as a sale and lease-back arrangement. The contemplated purchase price of the 50% undivided interest was to be $170,000, which included a commission of $35,000 to the brokers. The contemplated annual rental for the 50% undivided interest would be $17,000 per year.[1] Inasmuch as the "Purchase and Lease Agreements" provided that the rental would begin "as of May 1, 1964", it is apparent that the parties contemplated that the sale of the 50% interest would be fully accomplished by that date. However, the purchases by the individual plaintiffs were not simultaneously consummated, but rather were consummated over a period of approximately 10 months, terminating in February 1965. In fact, only a total of a 45% undivided interest was ever purchased. Individual documents called "Purchase and Lease Agreements" were entered into with each of the individual plaintiffs, and each of the individual plaintiffs received in return a separate deed to his undivided inter-

---

1. Paragraph 4 of the "Purchase and Lease Agreements" entered into between plaintiffs and defendants provided in specific terms for an annual rental of $17,000 payable annually. A great portion of the litigation and argument in the case below evolved around the question as to whether this was the sole benefit to which plaintiffs were entitled under the arrangement, or whether plaintiffs were also entitled to benefits accruing to their undivided interest by way of defendants' payment of taxes, capital improvements, and mortgage principal and interest payments.

est in the real property.[2] No independent document by way of a formal lease-back agreement was ever made, and one of the major controversies arising in the trial court concerns the necessity of such a formal lease-back agreement.

The evidence reflects that the plaintiffs invested a total of $153,000 for which they acquired an undivided 45% ownership interest in the two apartment houses, subject to substantial mortgages. When the defendants failed to pay in cash the full amount of the above-discussed guaranteed annual rental, the plaintiffs filed a three claim action. The first claim alleged that the parties were tenants in common and sought an accounting. From the allegations of this claim, the exact nature of the accounting sought is uncertain. The second claim asked for a partition of the premises, and the third claim was for contractual rent in the amount of $17,000 per year pursuant to the provisions of the above-mentioned Purchase and Lease Agreements.

By way of answer, the defendants generally contended that the proposed agreement had never been consummated because only a 45% interest had been purchased, and further that plaintiffs were not entitled to "rental" as there had never been executed any formal lease back of the premises as contemplated. In addition, the defendants contended that the entire arrangement was not truly a sale at all but must be considered a mortgage transaction, and a usurious mortgage at that. By way of counterclaims, the defendants asked that title be quieted in themselves, and that the arrangements should be established as a mortgage and the loan declared usurious. Alternatively they contended that the plaintiffs had become partners or joint venturers with the defendants in the operation of the buildings and that in that capacity they had become liable for their share of the costs of operation. Hence they contended

that money was due and owing from the plaintiffs to them. The defendants also filed a third party claim against Fiduciary Research, Inc. and its officer Miller, who had been the brokers in the transaction, for the $31,500 that these parties had received out of the transaction.

On October 14, 1968, the parties proceeded to trial on the original pleadings. The admissions in the pleadings and plaintiffs' evidence established the above-recited facts. In addition, plaintiffs put on expert testimony concerning the value of the properties and introduced through defendants' certified public accountant the books and records relating to the accounts, management and operation of the apartments. Over the defendants' objection, the court decided and concluded that it should try the accounting matter itself in open court, without referring it to a master. The "Purchase and Lease Agreements" and the deeds to plaintiffs were also admitted into evidence. Because of later procedural developments, it is important to note that at this first trial the trial court refused to allow plaintiffs to introduce evidence concerning the *reasonable* rental value for plaintiffs' 45% undivided interest in the properties. After plaintiffs rested, defendants moved to dismiss plaintiffs' claims, and these motions were taken under advisement. Defendants then rested without putting on any evidence relating to its defenses, counterclaims, or third party claims against Fiduciary and Miller. The court then granted defendants' motion to dismiss plaintiffs' third claim (the contractual claim for rent), dismissed defendants' third party complaint against Fiduciary and Miller, and refused to allow plaintiffs to amend their first claim so as to convert it from an ambiguous "accounting" claim to a claim for rent due under the agreement of the parties. At that time the court took under advisement a ruling on the merits of plaintiffs' only remaining claims which

2. One of the plaintiffs never reached his deed. All parties admit that this was merely an oversight, and his rights have

been treated as though he had in fact received a deed to his proportionate interest.

were for an accounting and for partition. Approximately one week later on October 21, 1968, the court entered its own preliminary findings of fact and conclusions of law and orders. These findings and conclusions demonstrated the court's reasoning in dismissing plaintiffs' third claim for rent due under the lease provisions of the Purchase and Lease Agreements. The court found that the Purchase and Lease Agreements "are agreements for leases and not leases". However, the court did not consider the Purchase and Lease Agreements entirely void, but rather found that "through performance of the terms of the Purchase and Lease Agreements the plaintiffs and defendants entered into both the relationship of vendee and vendor as well as landlord and tenant." Although the trial court considered the Purchase and Lease Agreements sufficient to create the relationship of landlord and tenant, it did not consider binding the provisions of the Purchase and Lease Agreements as to the term of the tenancy (10 years) nor as to the amount of rental payments specified thereunder. Rather, the trial court found that the defendants remained in possession of the undivided interest sold to plaintiffs as tenants from year to year following the execution of the agreements; that the Purchase and Lease Agreements entered into by the parties were evidence that the parties intended rental payments in amounts provided for in such agreements; and that the agreements raised an inference that the rental payment provided for therein was a fair and reasonable satisfaction for the use and occupation by the defendants of the real property involved.

The trial court then found that defendants owed rent to plaintiffs for the years 1964, 1965, 1966 and 1967 on the basis of $17,000 per year, modified to reflect that plaintiffs had purchased only an undivided 45% interest rather than a 50% interest as

contemplated by the Purchase and Lease Agreements. The Court further found that plaintiffs were entitled to partition under their second claim "with all details thereof and orders relating thereto to be determined at a further hearing in this cause." Counsel for plaintiffs was directed to prepare and file findings of fact and conclusions of law within 10 days.

Thereafter the plaintiffs submitted findings which, for practical purposes, gave them judgment for an amount based upon the $17,000 figure. The defendants argued that the submitted findings were insufficient since they were based on the theory of rent and rental value alone, and that this is not what had been tried; the case had been tried as an accounting; that as an accounting they were at a minimum entitled to an offset for all proper expenditures made by defendants on behalf of plaintiffs; and that these off-sets, which covered operating expenses, property taxes, mortgage interest and mortgage principal reductions, if off-set against the rental, would result in the balance owing to the defendants.

■ Faced with these arguments the trial court modified its previously entered preliminary findings and conclusions so as to provide that defendants were entitled to a set-off for the pro rata amount of mortgage principal, mortgage interest and taxes paid by defendants on behalf of plaintiffs as disclosed by the evidence. When these calculations were finally filed[3] they showed that with the allowance of the court-ordered set-offs the net result was that *plaintiffs* owed defendants some $87,350 as of the cut-off date established in the court's order. The court then again reversed itself and on its own motion decided to reopen the case and to receive evidence on the following issues:

"1. The reasonable rental value of the undivided interest in the apartment prop-

---

3. Plaintiffs failed to submit the calculations ordered by the court. On May 29, 1969, the court ordered that the matter would be dismissed unless a written judgment was properly submitted to it. In response to this order, plaintiffs still did not submit calculations, but the defendants did.

erties owned by plaintiffs during the periods in question.

"2. The character and amount of set-off allowable to the defendants as credit against the reasonable rental value."

It is important to note that the court's order relating to the receipt of evidence as to the *reasonable* rental value was in direct conflict with its rulings at the initial trial during which it precluded evidence on this issue. Defendants objected to any reopening whatsoever, and also urged that a limited reopening would be highly prejudicial to defendants unless defendants were also allowed to reopen and present evidence on all of their alleged defenses, counterclaims and third party claims. Notwithstanding defendants' objections, the court did allow the limited reopening and a hearing was thereafter held, evidence received, and the court ultimately found that the reasonable annual rental value of plaintiffs' undivided interest was $40,378.95, and that the defendants were entitled to a set-off for each annual period in the amount of $25,078.95, constituting the amount of principal and interest paid by defendants for the benefit of the plaintiffs on the mortgages on the properties.

■ It is our opinion that in ordering the limited reopening, the court abused its discretion and that therefore the judgment must be reversed and the matter remanded for a new trial. In arriving at this conclusion we recognize that the power of the trial court to allow a reopening is highly discretionary. Peterson v. Valley National Bank, 90 Ariz. 361, 368 P.2d 317 (1962); Ariz.Rules Civ.Pro. 59(b), 16 A.R.S. (1956). However, it is an abuse of discretion to allow a reopening under circumstances which are prejudicial to the position of the opposing side. Hall v. Hickey, 156 Cal.App.2d 94, 319 P.2d 33 (1957); Williams v. Slade, 431 F.2d 605 (5th Cir. 1970). Here, if the trial court had allowed a complete reopening with an opportunity to defendants to reassert their defenses, counterclaims and cross-claims, it is doubtful that there would have been an abuse of

discretion. However, in the view of this Court the limited reopening was highly prejudicial to the defendants. While defendants might well have been willing to forego their defenses, counterclaims and cross-claims, and take their chances on any judgment which might legally be entered on the basis of the evidence originally presented by plaintiffs, an altogether different picture is presented when the court thereafter interjects a new theory of recovery—that of "reasonable rental"—and allows plaintiffs to introduce extensive evidence relating thereto, without allowing the defendants to then reassess their position and determine whether or not they wish to reconsider their original decision concerning the introduction of evidence on their defenses, counterclaims and cross-claims. In arriving at this conclusion the Court has taken into consideration the fact that the additional limited hearing increased considerably the possible amount of liability which defendants might incur.

On a retrial of this matter, the parties should be allowed to amend their pleadings as they see fit, an appropriate pretrial proceeding should be undertaken so as to eliminate as far as possible the procedural and substantive morass which was thrust upon the trial court in the initial proceedings in this matter.

In addition to the foregoing question, the defendants have raised other questions relating to the introduction of evidence which would in our opinion require reversal of the judgment entered by the trial court. However, inasmuch as these errors are of the type which would not likely occur again in a retrial of the matter, we will not discuss them in this already prolix opinion. Suffice it to say that in our opinion the rights of the plaintiffs to recover rental payments should be determined, insofar as possible, from the provisions of the Purchase and Lease Agreements entered into between the parties. While we agree with the court that the Purchase and Lease Agreements did not constitute in the technical sense actual leases, we also agree with the trial court's finding that these

agreements were in and of themselves sufficient to constitute "special agreements" between co-tenants so as to justify a finding that under these agreements the defendant co-tenants had the right to possession and had agreed to pay consideration for that right of possession to the plaintiff co-tenants as set forth in said Purchase and Lease Agreements. Upon retrial in considering the amount of rental which might be payable to plaintiffs, consideration should be given to all provisions of the Purchase and Lease Agreements, including those provisions relating to the recapture by defendants of amounts contributed for capital improvements and the agreements of the parties relating to division of net proceeds upon resale or refinancing.

The judgment is reversed and the matter remanded to the trial court for further proceedings not inconsistent with this opinion.

EUBANK and JACOBSON, JJ., concur.